**E-FILED**
Friday, 17 September, 2004  01:47:38 PM
Clerk, U.S. District Court, ILCD

# Exhibit A

1

1  IN THE UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3

4  TURNWOOD INDUSTRIES,

5          Plaintiff,

                              JUDGE MANOS
   -vs-                       CASE NO. 1:03 CV 1791

6  SHORELINE TRANSPORTATION,

7  INC.,

8          Defendant.

9                  -   -   -   -

10

11     Deposition of RUSSELL MAZZEO, taken as if

12  upon cross-examination before Todd L. Persson, a

13  Notary Public within and for the State of Ohio,

14  at the offices of Gallup, Burns & Associates,

15  1810 Superior Building, 815 Superior Avenue,

16  Cleveland, Ohio, at 10:00 a.m. on Friday, April

17  2, 2004, pursuant to notice and/or stipulations

18  of counsel, on behalf of the Plaintiff in this

19  cause.

20                  -   -   -   -

21             MEHLER & HAGESTROM
               Court Reporters

22
               CLEVELAND              AKRON
23      1750 Midland Building   1015 Key Building
        Cleveland, Ohio 44115   Akron, Ohio 44308
24         216.621.4984            330.535.7300
           FAX 621.0050            FAX 535.0050
25         800.822.0650            800.562.7100

2

1    APPEARANCES:

2        Matthew L. Alden, Esq.
         Gallup, Burns & Associates
3        1810 Superior Building
         815 Superior Avenue, East
4        Cleveland, Ohio  44114
         (216) 621-4636,
5
             On behalf of the Plaintiff;
6
         Mickey R. Dragash, Esq.
7        Doug S. Musick, Esq.
         Roetzel & Andress
8        10th Floor, One Cleveland Center
         1375 East Ninth Street
9        Cleveland, Ohio  44114
         (216) 623-0150,
10
             On behalf of the Defendant.
11
     ALSO PRESENT:
12
         Steve Svilar
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        W I T N E S S    I N D E X

2                                                          PAGE

3

4          CROSS-EXAMINATION
           RUSSELL MAZZEO
5          BY MR. ALDEN                                      4

6

7                        E X H I B I T    I N D E X

8

9          EXHIBIT                                          PAGE

10           Plaintiff's Deposition Exhibit 7               9

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
1              RUSSELL MAZZEO, of lawful age, called by

2         the Plaintiff for the purpose of

3         cross-examination, as provided by the Rules of

4         Civil Procedure, being by me first duly sworn, as

5         hereinafter certified, deposed and said as

6         follows:

7              CROSS-EXAMINATION OF RUSSELL MAZZEO

8         BY MR. ALDEN:

9    Q.   Mr. Mazzeo, my name is Matthew Alden, and as you

10        know, I represent Turnwood in the case filed by

11        them against Shoreline Transportation.

12             Any reason you can't answer any questions

13        today, such as illness or medication?

14   A.   No.

15   Q.   Can you give us your full name, please, for the

16        record.

17   A.   Russell Robert Mazzeo.

18   Q.   And what is your current business address?

19   A.   9920 York Theta Drive, North Royalton, Ohio.

20   Q.   How far did you go in school?

21   A.   Got my high school diploma.

22   Q.   Any business courses or --

23   A.   No.

24   Q.   Okay.  So you completed high school, and no other

25        education, formal education after that?
```

5

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | How long have you lived in Northeast Ohio? |
| 3 | A. | My whole life, including one year in Florida. |
| 4 | Q. | Are you married currently? |
| 5 | A. | Yes. |
| 6 | Q. | Do you have any kids? |
| 7 | A. | Yes. One. |
| 8 | Q. | Any community organizations that you belong to? |
| 9 | A. | No. |
| 10 | Q. | How about any professional organizations? |
| 11 | A. | I'm just an Ohio Trucking Association member. |
| 12 | Q. | What do you do for them? |
| 13 | A. | Nothing. They just have meetings. |
| 14 | Q. | So you're a member? |
| 15 | A. | Yes. |
| 16 | Q. | Do you go to the meetings? |
| 17 | A. | Yeah. I've been to a couple. |
| 18 | Q. | Don't hold any leadership position or -- |
| 19 | A. | No. Not at all. Just more information for the |
| 20 | | industry. |
| 21 | Q. | And currently you're the vice president of |
| 22 | | Shoreline Transportation? |
| 23 | A. | Correct. |
| 24 | Q. | How long have you been in that position? |
| 25 | A. | Since 1997. |

6

1    Q.   How long have you been in the trucking industry?

2    A.   Since 1990.

3    Q.   Were you in the workforce prior to 1990?

4    A.   No.

5    Q.   What industry, or what occupation were you in?

6    A.   I used to fabricate signs.

7    Q.   How long did you do that?

8    A.   For about five years.

9    Q.   And what did you do before fabricating signs?

10   A.   I worked in restaurants.  Just miscellaneous high

11        school stuff.

12   Q.   Where did you work before going to work for

13        Shoreline Transportation?

14   A.   For --

15   Q.   I'm sorry.  Let's go back.

16            The time period between 1990 and 1997 -- you

17        started in the trucking industry in 1990?

18   A.   Yes.

19   Q.   Where did you start with?

20   A.   Company called DL Freightways.

21   Q.   What did do you with them?

22   A.   Started in the warehouse.  Started at the bottom,

23        got in the office; payables, receivables,

24        collections.

25   Q.   What was the last position you held with them?

7

1   A.   Payables, receivables.

2   Q.   And then what was the next job that you held in

3        the trucking industry?

4   A.   Was Shoreline Transportation.

5   Q.   Okay.  What are your duties, generally, as vice

6        president of Shoreline Transportation?

7   A.   Just maintain the business.  We try to get more,

8        you know, sales, and pretty much everything.

9        When I first started, it was just done myself, so

10       I did all the billing and --

11  Q.   And you're also currently vice president of

12       Shoreline Express, is that correct?

13  A.   No.

14  Q.   No?  Okay.  I thought I had an answer to a

15       written question from an interrogatory answer

16       where you were listed as vice president of

17       Shoreline Express?

18  A.   Yeah.  You know, I don't have ownership, but I

19       was vice president.  I'm sorry.  I want to

20       correct that.

21  Q.   Certainly.

22  A.   But I have a percentage of ownership in Shoreline

23       Transportation.

24  Q.   Was is it that you do as vice president for

25       Shoreline Express?

8

```
 1   A.   Pretty much everything I do for Shoreline

 2        Transportation.  Just, you know, payables,

 3        receivables.  I pretty much oversee everything

 4        that happens --

 5   Q.   Are --

 6   A.   -- for the day of the operation.

 7   Q.   Are there separate payrolls for the two

 8        companies?

 9   A.   Yes.

10   Q.   And you receive a separate check, I guess, from

11        each one?

12   A.   Yes.

13   Q.   Let me ask you some questions about Shoreline

14        Express.

15            Jeannine Mazzeo-Sparks, is she related to

16        you?

17   A.   My mother.

18   Q.   Laura Mazzeo?

19   A.   Wife.

20   Q.   Wife.  Okay.  Any other family members that work

21        at Shoreline Express, either the office clericals

22        or the customer service representatives?

23   A.   For Shoreline Express?

24   Q.   Yes.

25   A.   Yeah.  I have a sister, I have a cousin.
```

9

1   Q.   Just those two?

2   A.   And I have a brother-in-law.

3   Q.   Is Donald Sparks married to your mom?

4   A.   Yes.

5   Q.   Okay.

6                    -   -   -   -

7        (Thereupon, Plaintiff's Deposition Exhibit 7

8        was marked for purposes of identification.)

9                    -   -   -   -

10  Q.   Mr. Mazzeo, you've been handed what's been marked

11       as Plaintiff's Deposition Exhibit 7, a two-page

12       document.  Look it over, and when you're ready to

13       discuss it, let me know.

14  A.   Okay.

15  Q.   Have you seen Deposition Exhibit 7 before today?

16  A.   Yes.

17  Q.   Okay.  This is a letter from I.C.X. to you dated

18       May 16, 2002, correct?

19  A.   Yes.

20  Q.   This letter references some claims that were

21       filed by Turnwood.  Can you describe for me

22       generally what involvement you had with respect

23       to those claims?

24  A.   Just to assist in the actual claim procedure.

25  Q.   And what was the assistance that you gave?

10

1   A.   I got Turnwood claim forms.

2   Q.   Did you assist them in completing those claim

3        forms?

4   A.   He maybe had a couple questions, but everything

5        else was self explanatory.

6   Q.   Were you the person that answered those questions

7        for Turnwood?  Were those directed to you,

8        personally?

9   A.   As far as -- what types of questions?

10  Q.   Well, I asked you what assistance you gave, and

11       you said my assistance was limited to there was a

12       couple questions that he had at Turnwood.  And

13       what I'm asking is --

14  A.   Yeah.  And they were very -- do you want the ship

15       date or your invoice date or, you know, something

16       like that.

17  Q.   Who was it that was asking those questions?

18  A.   Steve.

19  Q.   Steve Svilar?

20  A.   Yes.

21  Q.   Any other involvement that you had in assisting

22       with the completion of the claim forms?

23  A.   No.  I was on both ends.  I believe the woman's

24       name with I.C.X. their claims manager, was Jo-an.

25  Q.   In fact, she's the person that sent you

11

1        Deposition Exhibit 7, right?  Jo-an Brown?

2   A.   Right.

3   Q.   Okay.  So did you have any interactions with her

4        regarding Turnwood's claims?

5   A.   Other than, you know, they sent an adjuster over

6        to the meetings to, you know, have them look at

7        the materials; have us all there present,

8        actually.

9   Q.   So you were present for the inspection, I guess,

10       of Turnwood's product?

11  A.   Yes.  Through one of I.C.X.'s representatives who

12       they had obtained.

13  Q.   Okay.  And did you have conversations over the

14       phone with Jo-an Brown with I.C.X. regarding

15       Turnwood's claims?

16  A.   Not that I recall.  It might have been an initial

17       call, you know, you're going to be getting those

18       claims from Turnwood.

19  Q.   Okay.  Any conversations that you recall with

20       either I.C.X. or anybody about how Turnwood's

21       freight was either damaged or lost, or why it

22       didn't get to where it was supposed to go?

23  A.   Well, just they had PO issues, as far as the

24       numbers that were not transposed onto I.C.X.'s

25       bill of ladings, or what they used for the

12

1  delivery receipt.

2  Q.  Did you have any involvement in working on those

3      issues, trying to get those resolved?

4  A.  Yes.

5  Q.  What was your involvement?

6  A.  My involvement was calling I.C.X.'s terminal in

7      Huron and talking to those people there.

8  Q.  Huron, Ohio?

9  A.  Where their Ohio terminal is.  Terminal manager

10     there Don, and I forget his last name.  He was

11     the one that was filling those out and just

12     putting one PO number on it --

13 Q.  What --

14 A.  -- and using that for a delivery receipt.

15 Q.  Did you give him any different instructions other

16     than just using the one PO number?  Did you tell

17     him to do anything different?

18 A.  Yeah.  I told him use the PO numbers or use the

19     original bill of ladings that they pick it up on.

20 Q.  What did he say?

21 A.  They started doing that.  But it was a good 60

22     days where we found out what was happening.

23 Q.  And as far as you know, did that resolve the

24     problems that Turnwood was having with either

25     lost freight or damaged freight?

13

1    A.  That I recall, yes.

2    Q.  Okay.

3    A.  Well, that resolved the problem with the POs.

4    Q.  Okay.  What other problems did Turnwood have that

5        you were involved in?

6    A.  Just the damaged material.  That's the letter

7        that I'm looking at.

8    Q.  Did you ever speak with anybody from a company

9        called Dohrn Transportation?

10   A.  No.

11   Q.  Did you ever speak with anyone from Menards about

12       Turnwood's product?

13   A.  No.  Me personally, no.

14   Q.  Everything is based on what you know personally.

15       That's what I'm trying to find out.

16          Did you ever go -- were you involved in

17       initially getting Turnwood's business set up to

18       run their product?  Did you have any involvement

19       with that?

20   A.  Yeah.  I think everyone was involved.  Myself,

21       Don Sparks, the salesman of ours, Joe Fairclothe,

22       we sit down for every account and discuss the

23       nature of what they do.

24   Q.  So you recall having a meeting somewhere to

25       discuss Turnwood's business?

1    A.   Yes.

2    Q.   Where was that meeting at?

3    A.   In our office.

4    Q.   At Shoreline?

5    A.   Shoreline's office, correct.

6    Q.   Who was present for that meeting?  Was this an

7         internal meeting with just Shoreline people?

8    A.   Yes.

9    Q.   When you say Shoreline people, are you referring

10        to Shoreline Express or Shoreline Transportation?

11   A.   Pretty much both companies.

12   Q.   And in your mind, are they one in the same?

13   A.   Well, they were.  Shoreline Transportation had

14        their own broker authority.  We started out --

15        Shoreline Transportation started as a brokerage.

16   Q.   Okay.  And then at some point --

17   A.   At some point we had to split companies, due to

18        insurance companies wouldn't insure a dual

19        authority; meaning our brokerage authority and

20        our operating authority.

21   Q.   Okay.  But when you say Shoreline, in your

22        mind --

23   A.   When I say Shoreline, it could be Shoreline,

24        either company.

25   Q.   Okay.  For this meeting that you're telling me

15

1    about, Turnwood's business, when you say

2    Shoreline, you're not making a distinction

3    between Express and Transportation?  Is that

4    correct?

5  A.  Yes.

6  Q.  Okay.  So you're combining the two of them as one

7    in the same?

8  A.  Yeah.  That's just because of Shoreline

9    Transportation owns equipment, and we prefer to

10   go in different lines.  And Turnwood's business

11   maybe didn't fit our line, so we knew we would

12   broker it.

13 Q.  Were you involved personally with any discussions

14   with anybody from Turnwood where Turnwood was

15   told that their freight may be brokered, or would

16   be brokered?

17 A.  Oh, yes.  Right off the bat.  Right off the bat

18   that's how we started doing business.  Some

19   inbound wood from the South -- I'm not sure at

20   what point -- and it was flatbed material.

21   Turnwood knows we didn't own flatbeds.

22 Q.  How did they know the freight was going to be

23   brokered?  Tell me what conversation with anybody

24   from Shoreline that you were present at where

25   Turnwood was told we don't have flatbeds; we have

16

1      to broker this out to somebody?

2  A.  I don't know if the term broker was used.  If we

3      can't do it on our truck, we'll find someone to

4      do it for the same cost.

5  Q.  Did you have face-to-face meetings with Steve

6      Svilar, Pete Svilar, anybody from Turnwood where

7      you were there and you discussed how Turnwood's

8      product was going to be shipped?

9  A.  Right off the bat, no.

10  Q.  Okay.  So at some point in time --

11  A.  At some point in time yeah, we did have a

12      meeting.

13  Q.  Where was that meeting at?

14  A.  It was in Shoreline's office.

15  Q.  And somebody from Turnwood was present for that

16      meeting?

17  A.  Correct.

18  Q.  Who was it?

19  A.  Pete and Steve.

20  Q.  What was discussed, as you recall, about who

21      would physically transport the product, whether

22      it be Shoreline Transportation or somebody else?

23  A.  There was really no discussion pertaining to

24      that.  There was discussions regarding the

25      initial damaged material.

17

```
 1   Q.  So by the time of -- your recollection about that

 2       meeting with Pete and Steve was --

 3           What was the purpose of that meeting?  To

 4       discuss damaged or missing material?

 5   A.  Yeah.

 6   Q.  This meeting wasn't to discuss who was going to

 7       run the freight, or whether it was going to be

 8       brokered?

 9   A.  Not that I recall.

10   Q.  Were there any discussions that you had with

11       anybody from Turnwood where there was a

12       discussion about brokering the freight, or the

13       fact that I.C.X. or somebody else would run it?

14   A.  No.  There was a discussion about transferring

15       the freight.  Once loaded on a truck, as far as

16       in the industry, we say direct service; meaning

17       once it's on that truck, it did not leave that

18       truck until delivered to the appropriate store.

19   Q.  Is that the service that Turnwood told you guys

20       they wanted?

21   A.  Yes.

22   Q.  They wanted direct service?

23   A.  Yes.

24   Q.  And what was told to them?  Yes, we can provide

25       that; no, we can't?
```

18

```
 1   A.   Yes, we can.

 2   Q.   Was it yes, we can, but we use other people to

 3        help us do it?

 4   A.   Absolutely.

 5   Q.   Who was it that you told the guys from Turnwood

 6        we can provide that, but we use others to help

 7        us?  Was it you?

 8   A.   I'm sure several conversations with me or Don

 9        Sparks.

10   Q.   So as you sit here today, you recall specifically

11        that either you told Turnwood other companies

12        would be used, or Don Sparks told them other

13        companies would be used?

14   A.   Yes.

15   Q.   But you're not sure specifically who it was,

16        either you or him?  Or are you saying it was

17        both?

18   A.   It was probably both.  It was probably during a

19        meeting.  You know, we tell every customer the

20        same thing.  If we can't do it, we find someone

21        to do it.  If we can't do it, put on it our

22        trucks, we put it on somebody else's truck.

23        That's the way the industry is.  We're not a big

24        enough company to service all of our customers on

25        just our trucks.
```

19

1   Q.   Meaning Shoreline Transportation, correct?

2   A.   Correct.

3   Q.   Shoreline Express doesn't have trucks?  That's

4        not what they do?

5   A.   Correct.

6   Q.   Okay.  And there was never any written contract

7        with either Shoreline -- either of the Shoreline

8        entities, for lack of a better term, Express or

9        Transportation -- there was never a written

10       contract between the Shoreline companies and

11       Turnwood, right, regarding running Turnwood's

12       freight?

13  A.   Not that I recall.

14  Q.   Do you recall Turnwood ever saying that they

15       needed the freight to be delivered within five

16       days after it was picked up?

17  A.   Not that I recall.  I know that's pretty much

18       normal service requirements, but it's something

19       that we don't -- we can't guarantee it.  It's too

20       many variables, certainly in the winter months.

21       Turnwood would ship to Wisconsin, Minnesota.  We

22       could get delayed.  If you had a guarantee, our

23       rates would be double.

24  Q.   Do you recall if Turnwood made that request, just

25       so I'm clear, that they needed their product

20

```
1        delivered within five days of being picked up?  I

2        understand that you guys can't promise that, but

3        do you recall if they made that request or not?

4    A.  I don't recall.

5    Q.  Do you recall if Turnwood ever said we can't have

6        the loads broken down at all, meaning on a per

7        truck basis?  Once it's loaded on the truck, we

8        can't have the loads broken down at all prior to

9        them getting to the destination?

10   A.  Yes.  There were conversations.

11   Q.  Do you know if I.C.X. or Dohrn or any company

12       that freight was brokered out to, do you know if

13       they ever broke the loads down?

14   A.  That, I don't.

15   Q.  Okay.  In this stack of materials is what's been

16       marked as Plaintiff's Deposition Exhibit 6.  Take

17       a minute.  Take as long as you need.  Take a look

18       at that, and let me know when you're ready to

19       talk about it.

20   A.  Okay.

21   Q.  Mr. Mazzeo, have you seen Plaintiff's Deposition

22       Exhibit 6 before today?

23   A.  I don't recall seeing it, no.

24   Q.  That takes care of that.  My understanding is

25       there's litigation involving I.C.X. and Shoreline
```

21

```
 1        Express in Federal Court in Illinois.
 2             Are you aware of that?
 3    A.  Yes.
 4    Q.  Have you given a deposition in that case?
 5    A.  No.
 6    Q.  Have you been asked to sign an affidavit for that
 7        case?
 8    A.  Not that I recall.
 9    Q.  Do you know what an affidavit is?
10    A.  Not really.
11    Q.  It's okay if you don't.  It's a written piece of
12        paper.  You sign it, and then your signature is
13        notarized, and you're swearing that what you say
14        in the written statement is true.
15    A.  No.
16    Q.  Have you ever been deposed before at all, prior
17        to today?
18    A.  Yes.
19    Q.  What kind of case?
20    A.  Just a minor automobile accident --
21    Q.  Okay.
22    A.  -- when I was a teen-ager.
23    Q.  Okay.
24                   MR. ALDEN:  Give me a minute with
25            Mr. Svilar, and I think we're almost done.
```

22

```
1                      -   -   -   -

2              (Thereupon, a recess was had.)

3                      -   -   -   -

4              MR. ALDEN:  Back on the record.

5   Q.  Mr. Mazzeo, do you carry business cards that you

6       hand out to people?

7   A.  Yes.

8   Q.  How many do you have?  Do you have two separate

9       ones, or just one?

10  A.  Just one.

11  Q.  What does it say on it?

12  A.  Shoreline Transportation.

13  Q.  I'm going to also hand you what's been marked as

14      Plaintiff's Deposition Exhibit 4.  I ask you if

15      you've seen that before.

16  A.  I believe I have.

17  Q.  That talks about an inspection that was done, I

18      believe, at Shoreline Transportation's facility.

19      Were you present for that inspection?

20  A.  Yes.

21  Q.  Okay.  And there's some photographs that we've

22      got, bad Xerox copies of, attached to the back.

23      Do you know who took the photographs?  Was it the

24      MTI guy?

25  A.  You know, it may have been.
```

23

1   Q.   But you recognize those photographs?

2   A.   Yes.

3   Q.   Okay.  Let's look at Plaintiff's Deposition

4        Exhibit 5.  Take a look at that, and let me know

5        when you're ready.

6   A.   Okay.

7   Q.   Have you seen that?  Have you seen Plaintiff's

8        Deposition Exhibit 5 before today?

9   A.   Yes.

10  Q.   Okay.  And this appears to be another MTI

11       inspection services report?

12  A.   Uh-huh.

13  Q.   Is that a yes?

14  A.   Yes.

15  Q.   Okay.  Were you present for this inspection?  If

16       you look on it, the date is June 2002, according

17       to the report.  Were you present for the

18       inspection that occurred that day?

19  A.   As I recall, yes.

20  Q.   And, again, there's some photographs attached to

21       the back of this report.  Do you recognize those?

22  A.   I believe it's the same as these, maybe just

23       different analysis.

24  Q.   The same as on Deposition Exhibit 4?

25  A.   Uh-huh.

24

1   Q.   Is that a yes?

2   A.   Yes.

3   Q.   Do you know who took those photographs?  Did I

4        ask you that already?  Sorry if I did.

5   A.   Again, either MTI -- and I'm sure we took some

6        photographs ourselves.

7   Q.   Okay.

8   A.   And I'm not sure if these are actually those or

9        MTI's.

10  Q.   Do you know if -- if you guys have taken

11       photographs, would they still be in existence

12       today in a file somewhere?

13  A.   They should be.

14  Q.   Do you know, as you sit here today, whether you

15       did take photographs, or whether you still have

16       them?

17  A.   I know I physically went to Turnwood and had

18       taken photographs.

19  Q.   And what was the reason for taking those

20       photographs?

21  A.   They wouldn't release the damaged material they

22       said we were reliable for.  So I physically went

23       over there, of course, right around the corner --

24  Q.   Did you -- you didn't finish your answer.  Go

25       ahead.  I'm sorry.

25

1   A.   Yeah.  I mean, I physically went over there.

2   Q.   Where are those photographs, as we sit here

3       today?  Do you have them at Shoreline?

4   A.   I'm sure I do.

5   Q.   Okay.

6   A.   And it's pretty much the same three pallets of

7       material.

8   Q.   Okay.  Any other photographs that you're aware of

9       that were taken of any of Turnwood's product,

10      other than what we just talked about?

11  A.   Not that I can recall.

12            MR. ALDEN:  That's all the

13        questions I have for you.  I'd like you to

14        read and review the deposition --

15            THE WITNESS:  Okay.

16            MR. ALDEN:  -- and sign it.

17            THE WITNESS:  I'd like to.

18

19              _____

20            RUSSELL MAZZEO

21

22

23

24

25

1

2

C E R T I F I C A T E

3

4

5
The State of Ohio, )  SS:
County of Cuyahoga.)

6
    I, Todd L. Persson, a Notary Public within
and for the State of Ohio, authorized to

7
administer oaths and to take and certify
depositions, do hereby certify that the

8
above-named witness was by me, before the giving
of their deposition, first duly sworn to testify

9
the truth, the whole truth, and nothing but the
truth; that the deposition as above-set forth was

10
reduced to writing by me by means of stenotypy,
and was later transcribed into typewriting under

11
my direction; that this is a true record of the
testimony given by the witness; that said

12
deposition was taken at the aforementioned time,
date and place, pursuant to notice or stipulation

13
of counsel; and that I am not a relative or
employee or attorney of any of the parties, or a

14
relative or employee of such attorney, or
financially interested in this action; that I am

15
not, nor is the court reporting firm with which I
am affiliated, under a contract as defined in

16
Civil Rule 28(D).

17
    IN WITNESS WHEREOF, I have hereunto set my
hand and seal of office, at Cleveland, Ohio, this

18
20th day of ___April___ A.D. 20 04 .

19

20

21
Todd L. Persson, Notary Public, State of Ohio

22
1750 Midland Building, Cleveland, Ohio  44115
My commission expires July 28, 2007

23

24

25

*6*

# I.C.X.

**INTERSTATE CARRIERS XPRESS**
5501 Hall Street
St. Louis, Missouri 63147

Phone 314-381-3939 or 800-998-5013                    Fax 314-381-3222

May 16, 2002

Attn: Russ
Shoreline Transportation
P.O. BOX 33067
Cleveland, OH 44133

Re: Turnwood's Claim Nos. 0001, 0002, 0003, 0004, and 0005

Dear Russ:

Please be advised that I.C.X. is denying these claims based on the following:

Our procedure has been in the past (and on these, there were no exception to procedures) to drop an empty I.C.X. trailer at your yard. Then I.C.X. picks up the pre-loaded trailer that the Shoreline people have already signed for and that Turnwood had loaded. I.C.X. then takes this trailer back to our terminal, add what ever freight is necessary to fill out the load, and drop this trailer at our Chicago terminal. (Your shipments were in the nose) The Chicago terminal then takes the trailer over to Dohrn's dock, and drops this trailer for them to unload and picks up the empty left over there and returns to the terminal.

All five of these shipments were handled exactly in the same manner. In fact Dohrn called me personally on both occassions and advised me that they couldn't even take them off the I.C.X. trailer as the shipments were so messy because of just shrink wrapping these long objects on a very small pallet. They couldn't even figure out which ones belonged to which shipment. I had advised Mickey of this on both occassions so that he could explain the poor packaging problem on these 5 shipments and alert you that they were coming back.

I.C.X. never touched this freight, nor did Dohrn. The people at Turnwood just did not ship these to withstand the normal rigors of transportation. I am enclosing copies of where Dohrn signed for these as SLC also upon receiving the I.C.X. trailer and on some, noting that there was some damage. Your shipments never moved from the trailer that they were loaded on. Also, I checked with our safety department and there were no incidents reported by the driver of these trailers during that time frame.



PLAINTIFF'S EXHIBIT
*Dφ00.7*

SHR00184

7

Shoreline Transportation
May 16, 2002
Page two

I am sorry I can be of no further service to you in these matters.

Respectfully,
INTERSTATE CARRIERS XPRESS

Jo-An E. Brown
Claims Manager

Enclosures:

# Exhibit B



Mr. Don Sparks
Shoreline Transportation
York Theta Drive
N. Royalton Ohio

RE: Damaged materials and unsigned BOL and delivery times, and Rates

As of May 10,2002 we still have uncollected approximately 27,000 dollars in invoices that are have been payment refused due to lack of a signed proof of delivery. Menards corporate office sent some proofs of delivery but there were still other orders that we do not have a signed POD for. These delivery dates vary from starting from December until Mid January.

Damaged material, we have had an alarming amount of complaints regarding damaged material from all of our stores, our return rate to the wood waste center has gone from 4% to 7% Since December an increase of $45,990.00 this does not include the rejected loads from 2/25/02 which was a total of $10,100.00 and the last rejected load a from Ankeny another $2,918.00 dollars. From July 2001 till the end of November 2001 we did not receive a single returned order due to damage from December 2001 till April 2002 we have received 6 returned orders. There have been no changes in packaging , loading or shipping in this time period.

We have had numerous stores call and ask where there orders are only to find out that is taking upwards of a week and a half to unload some routes. For example Route 11 loaded 5-2-02 has not yet been delivered, as of 4:00 p.m. yesterday Cottage Grove MN was yet to receive its delivery . Guy the millwork manager physically walked to the receiving department and verified that nothing had arrived. Rt 11 is 952 miles and should be unloaded in a maximum of three days from leaving our facilities.

As per our agreement with Don and Joe payment terms with you company are 45 days. In recent weeks we have been asked to pay all invoices that are over 30 days, we are willing to pay you on time for everything that is due with in the terms that we agreed upon and feel that we have lived up to our end of the agreement.



When we first started doing business in late November we discussed rates for doing these running these routes and agreed to pay you for $1.40 per mile and 40 dollars per stop with the understanding that we would come to a more amicable agreement after you got a better feel for the business and the stores. I later asked when we can get a rate adjustment and was never given an answer. The total mileage for all 11 routes is 11,513 with a total 160 stops totaling $22,088.00 dollars every time we ship a route this is and increase of $ 5,570.00 dollars per shipping cycle with in recent months has been averaging 2 shipping cycles per month for a total increase in shipping expenses of $11,140 per month which we feel is a bit steep.

In closing we appreciate you co-operation helping us grow our business, and look forward to a long and mutually benefitial relationship between Turnwood Ind Inc and Shoreline Transportation but need some help in resolving some of the issues that we see.

Regards,

Petar Svilar
President
Turnwood Ind Inc

13015 York-Delta Drive, North Royalton, Ohio 44133
Phone: 440-582-4970 • Fax: 440-582-1122

TWI 00113

PAY TO THE ORDER OF
BANK ONE, I/A
COLUMBUS, OHIO 43271
► 044000067 ◄
FOR DEPOSIT ONLY
SHORELINE TRANSPORTATION, INC.
6280366304

0934  5 0 5 3 1

OCT 11 02

2911

**TURNWOOD INDUSTRIES, INC.**
13015 YORK-DELTA DRIVE
NORTH ROYALTON, OH 44133
PHONE (440) 582-4970

THE HUNTINGTON NATIONAL BANK
CLEVELAND, OHIO 44115
6-15-410

10/10/2002

PAY TO THE
ORDER OF    Shoreline Transportation

$ **84,377.00

Eighty-Four Thousand Three Hundred Seventy-Seven and 00/100************************************************** DOLLARS

Shoreline Transportation
PO BOX 33067
Cleveland, OH 44133

TWI 00114

MEMO

"002911"  ":041000153":  016617062 47"  ""0008437700"