IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| INTERSTATE CARRIER XPRESS, INC., | ) |
| Plaintiff, | ) CASE NO. 3:04-CV-03003 |
| v. | ) |
| | ) MAGISTRATE JUDGE: |
| | ) BYRON G. CUDMORE |
| SHORELINE EXPRESS, INC., | ) |
| Defendant/Third-Party Plaintiff, | ) |
| REGIONS BANK, | ) |
| Defendant, | ) |
| and | ) |
| TURNWOOD INDUSTRIES, INC., | ) |
| Third-Party Defendant. | ) |

FILED
SEP 24 2004
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DEFENDANT'S, SHORELINE EXPRESS, INC.,
REPLY MEMORANDUM TO PLAINTIFF'S
BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO
TRANSFER VENUE TO THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

**NOW COMES** Defendant, Shoreline Express, Inc. (the "Defendant"), by and through its undersigned counsel, and pursuant to Local Rule 7.1, and hereby submits this Reply Memorandum to Plaintiff's, Interstate Carrier Xpress, Inc. (the "Plaintiff"), Brief in Opposition to Defendant's Motion to Transfer Venue to the United States District Court for the Northern District of Ohio, Eastern Division.

I.  **LAW & ARGUMENT**

Courts should not encourage the simultaneous litigation of two essentially identical claims in separate federal courts. *Asset Allocation & Management Co. v. Western Employers Ins. Co.*, 892 F.2d 566, 573 (7th Cir.1989). There is a rebuttable presumption that the first-filed action should go forward and the second-filed action should be abated. *Id.* There should be little debate that the action before this Court is identical to the first-filed action in the United States District Court for the Northern District of Ohio, Eastern Division ("First Action").

The Defendant is an Ohio corporation that is a duly licensed broker of property with the Federal Motor Carrier Safety Administration ("FMCSA") of the United States Department of Transportation ("U.S. DOT"). The Defendant is the brokerage arm of Shoreline Transportation, Inc. ("Shoreline"). Shoreline is a corporation duly organized and existing under the laws of the State of Ohio with its principal place of business in North Royalton, Ohio. Shoreline is duly licensed and regulated under the operating authority issued by the U.S. DOT and is engaged in the performance of for-hire interstate motor carriage of general commodities pursuant to the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"). Shoreline operates as a regional interstate less-than-truckload ("LTL") motor carrier with a primary service area that encompasses the Northeast as well as, to a limited extent, portions of the Midwestern United States. See, *Deposition of Russell Mazzeo,* filed contemporaneously with this *Reply Brief.*

The Defendant, Shoreline and Third-Party Defendant, Turnwood Industries, Inc. ("Turnwood"), entered into an agreement whereby the Defendant and Shoreline would transport Turnwood's goods in interstate commerce. Due to Shoreline's regional service area and limited equipment availability, there were many times when Shoreline could not transport Turnwood's goods. In those instances the Defendant would facilitate the arrangement of transportation

services for Turnwood's goods by other duly licensed interstate motor carriers. One of those interstate motor carriers was the Plaintiff. The Plaintiff was contacted by the Defendant on numerous occasions to transport Turnwood's goods.

The dispute in the First Action is inextricably intertwined with the allegations contained in this action as both actions concern alleged damage to Turnwood's goods that were transported by the Plaintiff and subsequently damaged. See, *Deposition of Russell Mazzeo* at p. 7-13 as well as Exhibit A attached hereto and incorporated by reference. As a result of the damage to Turnwood's goods, Turnwood failed to remit payment to the Defendant for the arrangement and facilitation of transportation services on its behalf. The Defendant assisted Turnwood in the filing of cargo loss and damage claims with the Plaintiff. See, *Id.* The Plaintiff acknowledge the cargo loss and damage claims filed by Turnwood but denied the claims. See, *Deposition of Russell Mazzeo,* at Exhibit 7 attached hereto and incorporated herein at Exhibit B. As a result, since the Plaintiff denied the cargo loss and damage claims, Turnwood then refused to pay the Defendant. The Defendant, who did not physically transport the goods and was nothing more than an innocent third-party, refused to pay the Plaintiff's interstate freight charges.

Therefore, the action before this Court could not have arisen without the allegations asserted in the First Action. Thus, the two actions are inextricably intertwined and should be consolidated for both judicial economy as well as in the interest of justice. Common issues of fact and law are present in both cases. Since the First Action was filed before the present action logic dictates that this matter be transferred and consolidated with the First Action.

**WHEREFORE,** Defendant, Shoreline Express, Inc., respectfully moves this Court to issue an Order transferring the above captioned matter to the United States District Court for the Northern District of Ohio, Eastern Division, for consolidation with Case No. 03-CV-1791.

3

Respectfully Submitted,

_____
Donald J. Vogel (#6191438)
SCOPELITIS, GARVIN, LIGHT & HANSON
30 West Monroe Street
Suite 600
Chicago, Illinois 60603
(312) 422-1200 *telephone*
(312) 422-1224 *facsimile*

**COUNSEL FOR DEFENDANT & THIRD-PARTY PLAINTIFF, SHORELINE EXPRESS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, *Defendant's Reply Brief to Plaintiff's Memorandum in Opposition to Defendant's Motion to Transfer Venue to the United States District Court for the Northern District of Ohio, Eastern Division* was served upon the following named parties via Regular U.S. Mail on this 22nd day of September, 2004.

Drew T. Erwin, Esq.
Drew T. Erwin, Ltd.
317 North Sixth Street
Quincy, IL 62301
**COUNSEL FOR PLAINTIFF,
INTERSTATE CARRIER XPRESS**

Regions Bank
c/o Mr. Norm Atkins
888 Concord Road
Smyrna, GA 30081

Matthew L. Alden, Esq.
Gallup Burns & Associates
The Superior Building, Suite 1810
815 Superior Avenue, East
Cleveland, OH 44114
**COUNSEL FOR THIRD-PARTY DEFENDANT,
TURNWOOD INDUSTRIES, INC.**

_____
Donald J. Vogel

187731.1.107330.0002

# EXHIBIT A

| | | |
|---|---|---|
| 1 | A. | Payables, receivables. |
| 2 | Q. | And then what was the next job that you held in |
| 3 | | the trucking industry? |
| 4 | A. | Was Shoreline Transportation. |
| 5 | Q. | Okay.  What are your duties, generally, as vice |
| 6 | | president of Shoreline Transportation? |
| 7 | A. | Just maintain the business.  We try to get more, |
| 8 | | you know, sales, and pretty much everything. |
| 9 | | When I first started, it was just done myself, so |
| 10 | | I did all the billing and -- |
| 11 | Q. | And you're also currently vice president of |
| 12 | | Shoreline Express, is that correct? |
| 13 | A. | No. |
| 14 | Q. | No?  Okay.  I thought I had an answer to a |
| 15 | | written question from an interrogatory answer |
| 16 | | where you were listed as vice president of |
| 17 | | Shoreline Express? |
| 18 | A. | Yeah.  You know, I don't have ownership, but I |
| 19 | | was vice president.  I'm sorry.  I want to |
| 20 | | correct that. |
| 21 | Q. | Certainly. |
| 22 | A. | But I have a percentage of ownership in Shoreline |
| 23 | | Transportation. |
| 24 | Q. | Was is it that you do as vice president for |
| 25 | | Shoreline Express? |

8

1  A.  Pretty much everything I do for Shoreline
2      Transportation.  Just, you know, payables,
3      receivables.  I pretty much oversee everything
4      that happens --
5  Q.  Are --
6  A.  -- for the day of the operation.
7  Q.  Are there separate payrolls for the two
8      companies?
9  A.  Yes.
10 Q.  And you receive a separate check, I guess, from
11     each one?
12 A.  Yes.
13 Q.  Let me ask you some questions about Shoreline
14     Express.
15         Jeannine Mazzeo-Sparks, is she related to
16     you?
17 A.  My mother.
18 Q.  Laura Mazzeo?
19 A.  Wife.
20 Q.  Wife.  Okay.  Any other family members that work
21     at Shoreline Express, either the office clericals
22     or the customer service representatives?
23 A.  For Shoreline Express?
24 Q.  Yes.
25 A.  Yeah.  I have a sister, I have a cousin.

```
1   Q.   Just those two?
2   A.   And I have a brother-in-law.
3   Q.   Is Donald Sparks married to your mom?
4   A.   Yes.
5   Q.   Okay.
6                    - - - -
7             (Thereupon, Plaintiff's Deposition Exhibit 7
8        was marked for purposes of identification.)
9                    - - - -
10  Q.   Mr. Mazzeo, you've been handed what's been marked
11       as Plaintiff's Deposition Exhibit 7, a two-page
12       document.  Look it over, and when you're ready to
13       discuss it, let me know.
14  A.   Okay.
15  Q.   Have you seen Deposition Exhibit 7 before today?
16  A.   Yes.
17  Q.   Okay.  This is a letter from I.C.X. to you dated
18       May 16, 2002, correct?
19  A.   Yes.
20  Q.   This letter references some claims that were
21       filed by Turnwood.  Can you describe for me
22       generally what involvement you had with respect
23       to those claims?
24  A.   Just to assist in the actual claim procedure.
25  Q.   And what was the assistance that you gave?
```

| | | |
|---|---|---|
| 1 | A. | I got Turnwood claim forms. |
| 2 | Q. | Did you assist them in completing those claim |
| 3 | | forms? |
| 4 | A. | He maybe had a couple questions, but everything |
| 5 | | else was self explanatory. |
| 6 | Q. | Were you the person that answered those questions |
| 7 | | for Turnwood? Were those directed to you, |
| 8 | | personally? |
| 9 | A. | As far as -- what types of questions? |
| 10 | Q. | Well, I asked you what assistance you gave, and |
| 11 | | you said my assistance was limited to there was a |
| 12 | | couple questions that he had at Turnwood. And |
| 13 | | what I'm asking is -- |
| 14 | A. | Yeah. And they were very -- do you want the ship |
| 15 | | date or your invoice date or, you know, something |
| 16 | | like that. |
| 17 | Q. | Who was it that was asking those questions? |
| 18 | A. | Steve. |
| 19 | Q. | Steve Svilar? |
| 20 | A. | Yes. |
| 21 | Q. | Any other involvement that you had in assisting |
| 22 | | with the completion of the claim forms? |
| 23 | A. | No. I was on both ends. I believe the woman's |
| 24 | | name with I.C.X. their claims manager, was Jo-an. |
| 25 | Q. | In fact, she's the person that sent you |

1    Deposition Exhibit 7, right?  Jo-an Brown?
2 A. Right.
3 Q. Okay.  So did you have any interactions with her
4    regarding Turnwood's claims?
5 A. Other than, you know, they sent an adjuster over
6    to the meetings to, you know, have them look at
7    the materials; have us all there present,
8    actually.
9 Q. So you were present for the inspection, I guess,
10    of Turnwood's product?
11 A. Yes.  Through one of I.C.X.'s representatives who
12    they had obtained.
13 Q. Okay.  And did you have conversations over the
14    phone with Jo-an Brown with I.C.X. regarding
15    Turnwood's claims?
16 A. Not that I recall.  It might have been an initial
17    call, you know, you're going to be getting those
18    claims from Turnwood.
19 Q. Okay.  Any conversations that you recall with
20    either I.C.X. or anybody about how Turnwood's
21    freight was either damaged or lost, or why it
22    didn't get to where it was supposed to go?
23 A. Well, just they had PO issues, as far as the
24    numbers that were not transposed onto I.C.X.'s
25    bill of ladings, or what they used for the

| | | |
|---|---|---|
| 1 | | delivery receipt. |
| 2 | Q. | Did you have any involvement in working on those |
| 3 | | issues, trying to get those resolved? |
| 4 | A. | Yes. |
| 5 | Q. | What was your involvement? |
| 6 | A. | My involvement was calling I.C.X.'s terminal in |
| 7 | | Huron and talking to those people there. |
| 8 | Q. | Huron, Ohio? |
| 9 | A. | Where their Ohio terminal is. Terminal manager |
| 10 | | there Don, and I forget his last name. He was |
| 11 | | the one that was filling those out and just |
| 12 | | putting one PO number on it -- |
| 13 | Q. | What -- |
| 14 | A. | -- and using that for a delivery receipt. |
| 15 | Q. | Did you give him any different instructions other |
| 16 | | than just using the one PO number? Did you tell |
| 17 | | him to do anything different? |
| 18 | A. | Yeah. I told him use the PO numbers or use the |
| 19 | | original bill of ladings that they pick it up on. |
| 20 | Q. | What did he say? |
| 21 | A. | They started doing that. But it was a good 60 |
| 22 | | days where we found out what was happening. |
| 23 | Q. | And as far as you know, did that resolve the |
| 24 | | problems that Turnwood was having with either |
| 25 | | lost freight or damaged freight? |

```
 1   A.   That I recall, yes.
 2   Q.   Okay.
 3   A.   Well, that resolved the problem with the POs.
 4   Q.   Okay.  What other problems did Turnwood have that
 5        you were involved in?
 6   A.   Just the damaged material.  That's the letter
 7        that I'm looking at.
 8   Q.   Did you ever speak with anybody from a company
 9        called Dohrn Transportation?
10   A.   No.
11   Q.   Did you ever speak with anyone from Menards about
12        Turnwood's product?
13   A.   No.  Me personally, no.
14   Q.   Everything is based on what you know personally.
15        That's what I'm trying to find out.
16            Did you ever go -- were you involved in
17        initially getting Turnwood's business set up to
18        run their product?  Did you have any involvement
19        with that?
20   A.   Yeah.  I think everyone was involved.  Myself,
21        Don Sparks, the salesman of ours, Joe Fairclothe,
22        we sit down for every account and discuss the
23        nature of what they do.
24   Q.   So you recall having a meeting somewhere to
25        discuss Turnwood's business?
```

14

1  A.  Yes.
2  Q.  Where was that meeting at?
3  A.  In our office.
4  Q.  At Shoreline?
5  A.  Shoreline's office, correct.
6  Q.  Who was present for that meeting?  Was this an
7      internal meeting with just Shoreline people?
8  A.  Yes.
9  Q.  When you say Shoreline people, are you referring
10     to Shoreline Express or Shoreline Transportation?
11 A.  Pretty much both companies.
12 Q.  And in your mind, are they one in the same?
13 A.  Well, they were.  Shoreline Transportation had
14     their own broker authority.  We started out --
15     Shoreline Transportation started as a brokerage.
16 Q.  Okay.  And then at some point --
17 A.  At some point we had to split companies, due to
18     insurance companies wouldn't insure a dual
19     authority; meaning our brokerage authority and
20     our operating authority.
21 Q.  Okay.  But when you say Shoreline, in your
22     mind --
23 A.  When I say Shoreline, it could be Shoreline,
24     either company.
25 Q.  Okay.  For this meeting that you're telling me

# [EXHIBIT B]

# I.C.X.

**INTERSTATE CARRIERS XPRESS**
5501 Hall Street
St. Louis, Missouri 63147

Phone 314-381-3939 or 800-998-5013                Fax 314-381-3222

May 16, 2002

Attn: Russ
Shoreline Transportation
P.O. BOX 33067
Cleveland, OH 44133

Re: Turnwood's Claim Nos. 0001, 0002, 0003, 0004, and 0005

Dear Russ:

Please be advised that I.C.X. is denying these claims based on the following:

Our procedure has been in the past (and on these, there were no exception to procedures) to drop an empty I.C.X. trailer at your yard. Then I.C.X. picks up the pre-loaded trailer that the Shoreline people have already signed for and that Turnwood had loaded. I.C.X. then takes this trailer back to our terminal, add what ever freight is necessary to fill out the load, and drop this trailer at our Chicago terminal. (Your shipments were in the nose) The Chicago terminal then takes the trailer over to Dohrn's dock, and drops this trailer for them to unload and picks up the empty left over there and returns to the terminal.

All five of these shipments were handled exactly in the same manner. In fact Dohrn called me personally on both occassions and advised me that they couldn't even take them off the I.C.X. trailer as the shipments were so messy because of just shrink wrapping these long objects on a very small pallet. They couldn't even figure out which ones belonged to which shipment. I had advised Mickey of this on both occassions so that he could explain the poor packaging problem on these 5 shipments and alert you that they were coming back.

I.C.X. never touched this freight, nor did Dohrn. The people at Turnwood just did not ship these to withstand the normal rigors of transportation. I am enclosing copies of where Dohrn signed for these as SLC also upon receiving the I.C.X. trailer and on some, noting that there was some damage. Your shipments never moved from the trailer that they were loaded on. Also, I checked with our safety department and there were no incidents reported by the driver of these trailers during that time frame.



SHR00184

7

Shoreline Transportation
May 16, 2002
Page two

I am sorry I can be of no further service to you in these matters.

Respectfully,
INTERSTATE CARRIERS XPRESS

Jo-An E. Brown
Claims Manager

Enclosures:

SHR00185